EDWARDS WILDMAN PALMER LLP
Rory J. McEvoy
Attorney for Defendant
750 Lexington Avenue
New York, New York 10022
212.308.4411
rmcevoy@edwardswildman.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

PHILOMENA CINDY RINALDI,

          Plaintiff,

     -against-

QUALITY KING DISTRIBUTORS, INCORPORATED,

          Defendant.

---

No. CV 12-0141 (PKC) (ARL)

**RULE 56.1 STATEMENT**

In accordance with Rule 56.1 of the Local Civil Rules of this Court, Defendant Quality King Distributors, Incorporated ("Quality King") submits the following statement of material facts not in dispute.

1.     Quality King is in the business of selling health and beauty products to retailers throughout the United States.  (Compl. ¶9).

2.     GSN Trucking ("GSN") is a Quality King subsidiary that employs the truck drivers who deliver Quality King's goods. (Pl. Tr. 15-16).

3.     Rinaldi applied for and was hired as an assistant payroll clerk at GSN.  In 2005, she was promoted to payroll manager. (Pl. Tr. 15-17; Lan. Tr. 18, 28).

4.     After her promotion, Quality King consolidated the GSN payroll department with the Quality King payroll department and, at that point, Rinaldi became employed by Quality King.  (Pl. Tr. 17-18).

5.     After the consolidation, Rinaldi's job functions remained unchanged; she was still the payroll manager for all GSN employees, however, she now reported to the Human Resources Director at Quality King, Olga Lancaster ("Lancaster").  (Pl. Tr. 19, 28).

6.     In addition to Rinaldi and Lancaster, the payroll department had two other employees, Phylis Calderone ("Calderone"), Quality King's payroll manager, who was responsible for paying over 1000 Quality King employees, and Linda Semelrath ("Semelrath"), Calderone's assistant during the relevant time period.  (Pl. Tr. 19-21; Lan. Tr. 35, 36).

7.     When Semelrath was hired, Rinaldi trained her to perform Rinaldi's job functions as a backup for when Rinaldi was absent.  (Pl. Tr. 22; Lan. Tr. 37-38).

8.     Rinaldi managed the weekly payroll of about 100 GSN Trucking employees.  (Pl. Tr. 28-29).

9.     Rinaldi's job duties included processing the driver route logs for all truckers and calculating the mileage pay, delivery pay, pickup pay, case count, breakdown pay, layover pay, and training pay to which each trucker was entitled for the previous week.  (Pl. Tr. 30-50, Ex. 2).

10.     During a typical week, Rinaldi would process between 115 and 120 route logs. (Pl. Tr. 42).

11.     Although route logs were continuously coming in, the start of each week's payroll processing began on Thursday afternoon.  (Pl. Tr. 42-43).

12.     From Thursday afternoon until Tuesday afternoon, Rinaldi would process route logs one at a time.  (Pl. Tr. 42-43).

13.     Beginning on Wednesday morning, Rinaldi entered the information she obtained from the logs into the payroll processing software.  (Pl. Tr. 44-47).

14.     This information had to be submitted by 1 p.m. on Wednesday in order for a register to be created for Rinaldi to review and approve by 3 p.m. (Pl. Tr. 44-47).

15.     If Rinaldi did not meet these deadlines, GSN employees would not get paid. On Thursday mornings, Rinaldi would personally stuff paychecks into envelopes for the GSN employees, and in the afternoon, she would once again begin processing route logs. (Pl. Tr. 47-48).

16.     In addition to payroll, Rinaldi also handled health insurance for all GSN employees, processed cash advance requests (which had to be taken in person over the phone), kept track of vacation, sick time and absences, and submitted monthly reports to the Accounting Department. (Pl. Tr. 30-31, 48-49, Ex. 2; Lan. Tr. 34).

17.     When Rinaldi began working at Quality King, she received a copy of the Employee Handbook (the "Handbook"), which contains policies on discrimination, the FMLA, and attendance. (Pl. Tr. 52-55, 80-81).

18.     Rinaldi signed a document acknowledging receipt of these policies, (Pl. Tr. 52-53, Ex. 5), and testified that she understood them. (Pl. Tr. 55, 81).

19.     The Handbook sets forth Quality King's policy prohibiting all forms of employment discrimination, including disability discrimination. (Pl. Tr. 52-55, Exs. 5,6; Lan. Tr. 40-41).

20.     The policy "relates to all terms and conditions of employment, including . . . discipline, . . . leave of absence, . . .and other working conditions." The Handbook invites employees with disabilities to alert Quality King of the need for an accommodation and further states that Quality King would "be happy to work with [employees] to make [their] job[s] easier

and more productive in full compliance with any applicable legal requirements to make reasonable accommodations . . ." (Pl. Tr. 54, Ex. 6).

21. Employees "are encouraged to bring these [questions or concerns] to the attention of their immediate supervisor and the Human Resources Department." (Pl. Tr. 54, Ex. 6).

22. Quality King's policy also prohibits retaliation against employees who complain about discrimination, and the Employee Handbook assures employees that they "can raise concerns and make reports without fear of reprisal." (Pl. Tr. 54, Ex. 6).

23. Employees who work at Quality King for at least one year and for over 1250 hours during the previous 12 months are eligible for a maximum of twelve weeks of leave per year pursuant to Quality King's FMLA policy. (Pl. Tr. 86, Ex. 10; Lan. Tr. 53).

24. The policy states that "[u]npaid leave *must* be granted for . . . a serious health condition that make[s] the employee unable to perform the employee's job." (Pl. Tr. 86, Ex. 10; Lan. Tr. 53).

25. At either "the employee or employer's option, certain kinds of paid leave may be substituted for unpaid leave." (Pl. Tr. 86, Ex. 10; Lan. Tr. 53).

26. Further, "[t]he employee may be required to provide advance leave notice and medical certification" and "leave may be denied if requirements are not met." *Id.*

27. The FMLA section of the Employee Handbook also states that employees will be "restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms." (Pl. Tr. 80, Ex. 10).

28. It further states that the "FMLA makes it unlawful for an employer to: interfere with, restrain, or deny the exercise of rights provided under FMLA; discharge or discriminate

against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA." (Pl. Tr. 80, Ex. 10).

29.     Rinaldi understood her right to take time off under the FMLA, not only because she read the Handbook, but also because she processed FMLA forms for other employees as part of her regular job functions. (Pl. Tr. 80-81, 85-86).

30.     Rinaldi also understood her obligation to obtain certification from her doctor, and knew that the only employees ever terminated after exercising their FMLA rights were those that took more than the statutory twelve weeks. (Pl. Tr. 88, 91-92).

31.     Quality King's attendance policy requires that if an employee is "absent for three consecutive days or more due to an illness or injury, [they] are required to bring a 'fitness for duty' letter from a physician in order to return to work." (Pl. Tr. 71, Ex. 9).

32.     Rinaldi's non-FMLA-related absences for which she sought no medical attention, never exceeded two (2) consecutive days, and generally fell around a weekend. (Pl. Tr. 57, 103-30, Ex. 7).

33.     On March 17, 2011, Rinaldi did not come to work because she was suffering from anxiety, panic attacks and depression. (Pl. Tr. 73).

34.     Rinaldi called Calderone to report that she could not make it into work. (Pl. Tr. 74).

35.     Rinaldi was admitted to the hospital for eight (8) days beginning on March 17, 2011, and her husband notified Quality King of Rinaldi's hospitalization. (Pl. Tr. 76).

36.     Rinaldi stayed in contact with Calderone while she was in the hospital, and told Calderone that she was out because of depression. (Pl. Tr. 78, 80).

37.     Quality King designated Rinaldi's time out as FMLA leave. (Pl. Tr. 78).

38.     This was Rinaldi's first FMLA leave.  Even though she understood that she could take leave under the FMLA without retaliation, she "didn't want to take any time off" and she "was worried about [her] job" and "very nervous and apprehensive" about everything.  (Pl. Tr. 82, 91-92).

39.     On April 4, 2011, Lancaster sent Rinaldi a letter describing her rights under the FMLA and attaching the forms necessary for approval of Rinaldi's leave.  (Pl. Tr. 82-83, Ex. 11).

40.     The leave was approved and lasted for five weeks and two days, through April 22, 2011.  (Pl. Tr. 95; Lan. Tr. 63-64).

41.     Quality King paid Rinaldi her normal salary for the first three weeks of her leave and then used all but one day of her vacation/sick time to continue paying her for the remainder of the leave.  (Pl. Tr. 95-96).

42.     During her last week of leave, Calderone visited Rinaldi at her home and "made [Rinaldi] understand that no matter how [she] felt, [] they would back [her] up."  (Pl. Tr. 99).

43.     Rinaldi returned to work on April 25, 2011.  (Pl. Tr. 102).

44.     After returning from her leave, Rinaldi was absent on ten days over a two and a half month period from May 13, 2011 to July 29, 2011.  (Pl. Tr. 130).

45.     Rinaldi was absent with no advance notice on Friday May 13, Friday June 3, Monday June 13, Wednesday and Thursday June 29-30, Thursday and Friday July 14 and 15, and Friday July 29.  (Pl. Tr. 57, 103-30, Ex. 7).

46.     On all of these occasions, Rinaldi called Calderone around 8 a.m. to inform her that she "was unable to come to work."  (Pl. Tr. 103-30).

47.     Rinaldi never informed Calderone that her absence was due to depression or gave Calderone or Quality King any indication that might be the case.  (Pl. Tr. 103-30).

6

48.     On all of these occasions, Rinaldi did not call, speak to or see a doctor, and she did not obtain doctor's notes.

49.     Rinaldi was also absent on Thursday and Friday July 7 and 8, 2011 for a planned vacation, but because she had no time left to take, it was unpaid.  (Pl. Tr. 121).

50.     Over the course of these two and a half months, Rinaldi never sought an accommodation to her work schedule, (Pl. Tr. 130-31).

51.     On Friday July 29, 2011, which was Rinaldi's tenth absence unrelated to her depression since her return to work following her approved FMLA, Lancaster prepared and left a warning for Rinaldi due to her excessive absenteeism.  (Pl. Tr. 132; Lan. Tr. 67-70).

52.     The warning letter noted that Rinaldi had been absent ten days since coming back from leave, and stated that the functions of the job require "attention to detail" and availability "to tend to the needs of the employees that [Rinaldi] prepares payroll for."  (Pl. Tr. 132, Ex. 14; Lan. Tr. 75-76).

53.     The notice also stated that Rinaldi's absenteeism was "affecting the department as a whole" because "[t]he rest of the staff is picking up the slack which is not fair."  (Pl. Tr. 132, Ex. 14; Lan. Tr. 75-76).

54.     The notice indicated that Rinaldi was being put on a 90-day probation and that if she "is absent for any reason in the next 90 days, [Quality King] would have no alternative but to terminate her."  (Pl. Tr. 132, Ex. 14; Lan. Tr. 85).

55.     Rinaldi did not receive the notice until she returned to work on Monday August 1, 2011 at which point the 90-day probation began.  (Pl. Tr. 132).

56.     The same day that Rinaldi received the warning notice, August 1, 2011, she left after reviewing it, and was "immediately" absent from work.  (Pl. Tr. 138).

57.     Rinaldi went to the hospital, but was not admitted.  (Pl. Tr. 141; Lan. Tr. 90).

58.     On August 2, 2011, Rinaldi called Calderone to inform her that she was having a bad reaction to her depression medication and her doctor instructed her to remain home for the rest of the week (which she did).  (Pl. Tr. 142-43; Lan Tr. 91).

59.     On August 4, 2011, Lancaster wrote Rinaldi a letter acknowledging that Rinaldi's absence was for the purpose of seeking "more medical attention for [her] condition."  (Pl. Tr. 143, Ex 15; Lan. Tr. 88-92).

60.     The letter said that with a doctor's note, the week-long absence would be considered FMLA leave.  (Pl. Tr. 143, Ex 15; Lan. Tr. 88-92).

61.     The letter also offered Rinaldi the option to "take the remainder of [her] FMLA leave" or to return to work (with the appropriate doctor's note) to continue serving out her probationary period.  (Pl. Tr. 143, Ex 15; Lan. Tr. 88-92).

62.     Rinaldi chose to return to work full time because she preferred to take intermittent FMLA leave, rather than take a single bloc of time.  (Pl. Tr. 142, 147).

63.     During the probationary period, Rinaldi did not seek any accommodation to her work schedule.  (Pl. Tr. 130-31).

64.     Quality King offered Rinaldi the opportunity to work fewer hours per day, but she declined the offer.  *Id.*

65.     Rinaldi was absent for two days on October 27 and 28, 2011 due to a "pain in [her] right side."  (Pl. Tr. 148-51).

66.     Rinaldi was not hospitalized for this condition, she had never had this pain before, and she never had it again.  (Pl. Tr. 148-51).

67.     Rinaldi brought in a doctor's note, written on a prescription pad that stated: "please excuse the above patient from work 10/27, 10/28. May return on 10/31." (Pl. Tr. 151).

68.     When Rinaldi returned to work on October 31, 2011, she gave the note to Lancaster, and Lancaster informed her that she was being terminated for violating her probation. (Pl. Tr. 152; Lan. Tr. 101).

69.     After her leave and despite the fact that she only had one vacation day left, Rinaldi was absent ten times in a two and a half month period.  (Pl. Tr. 130).  Despite warnings and probation, Rinaldi failed to meet Quality King's attendance requirements.

70.     On the days that Rinaldi was absent without prior notice, other employees in the department had to perform her duties because, if her tasks were not completed in a timely fashion, more than 100 drivers would not get paid on time.  (Pl. Tr. 44-47).

71.     Semelrath (Calderone's assistant) was trained to complete Rinaldi's duties to cover for her when she was absent.  (Pl. Tr. 22-23).

72.     Covering for Rinaldi in her absence was not Semelrath's only job duty.  (Pl. Tr. 22-28).

73.     Rinaldi's unscheduled absences prevented Semelrath and the rest of the department from being able to plan to have her duties covered, and on any given day when Rinaldi was absent without notice, other employees in the department had to forego some of their usual duties to complete Rinaldi's payroll responsibilities.  This created a burden on Plaintiff's department.  (Pl. Tr. 132, Ex. 14.).

74.     While Rinaldi was on probation, Quality King offered to reduce her hours and offered her the opportunity to take more FMLA leave.  (Pl. Tr. 131, 143, 147-148, Ex. 15).

75.    Rinaldi refused both offers because she claimed that she could not afford to take time off or reduce her hours and did not believe that either accommodation would address her needs. (Pl. Tr. 131, 145-47).

76.    The absences that culminated in Plaintiff's probation were her ten absences between May 13 and July 29, 2011, not the FMLA-designated absences from March 17 to April 22, 2011. (Pl. Tr. 132, Ex. 14).

77.    None of these absences were related to Rinaldi's depression. (Pl. Tr. 154-56).

78.    Rinaldi never told Quality King that these absences were for depression – she merely called in sick or stated that she could not come to work. (Pl. Tr. 103-30).

79.    The absences that resulted in Rinaldi's discharge were the unscheduled absences on October 27 and 28, 2011 for alleged pain in her side. (Pl. Tr. 149-51).

80.    Rinaldi did not have a serious medical condition, as defined by the FMLA, because she did not receive inpatient care, and she did not require continuing treatment by her doctor. (Pl. Tr. 149-51).

81.    Rinaldi (i) applied for and was granted FMLA leave in March of 2011; (ii) was granted additional leave by Quality King from August 1-5, 2011; and (iii) was not discharged until October 31, 2011. (Pl. Tr. 82, 102, 143-44, 151-52, Ex. 15).

Date:   May 31, 2013
        New York, New York                    EDWARDS WILDMAN PALMER LLP


                                        By: _____
                                              Rory J. McEvoy

10

EDWARDS WILDMAN PALMER LLP
Rory J. McEvoy
Attorney for Defendant
750 Lexington Avenue
New York, New York 10022
212.308.4411
rmcevoy@edwardswildman.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

PHILOMENA CINDY RINALDI,

                Plaintiff,

       -against-

QUALITY KING DISTRIBUTORS, INCORPORATED,

             Defendant.
_____

No. CV 12-0141 (PKC) (ARL)

**AFFIDAVIT OF SERVICE**

| STATE OF NEW YORK | ) | |
|---|---|---|
| | ) | ss.: |
| COUNTY OF NEW YORK | ) | |

Jean W. McLoughlin, being duly sworn, deposes and says that she is over the age of eighteen; is not a party to this action; and that on the 31st day of May 2013, she caused true and correct copies of the foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, RULE 56.1 STATEMENT, and NOTICE OF MOTION with declaration and exhibits annexed thereto to be served upon:

Paul L. Dashefsky, Esq.
317 Middle Country Road
Smithtown, New York 11787

by depositing true copies of said documents enclosed in a prepaid, sealed wrapper, properly addressed to the above-named party, in an official depository under the exclusive care and custody of the United States Postal Service, first class mail, within the State of New York and by electronic mail.

Jean W. McLoughlin

Sworn to before me this
31st day of May 2013

Notary Public

JULIE L. SAUER
Notary Public, State of New York
No. 02SA6233540
Qualified in New York County
Commission Expires December 27, 20 14