UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

PHILOMENA CINDY RINALDI,

                    Plaintiff,

                                                    **MEMORANDUM & ORDER**
          v.                                        12-CV-141 (PKC)

QUALITY KING DISTRIBUTORS, INC.,

                    Defendant.
-----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

        Plaintiff Philomena Cindy Rinaldi ("Rinaldi") brings this action against her former

employer Quality King Distributors, Incorporated ("Quality King") for terminating her

employment in violation of the Americans with Disabilities Act ("ADA") and the New York

State Human Rights Law ("NYSHRL"), and for interfering with her rights under, and retaliating

against her in violation of, the Family and Medical Leave Act ("FMLA").  Plaintiff alleges that

she was discouraged from using FMLA leave, and terminated based on her use of such leave and

because of her disability.  Quality King defends its actions primarily on the basis that Plaintiff's

chronic unexcused absenteeism rendered her unable to perform the essential functions of her job,

and constituted a non-discriminatory, non-retaliatory justification for her termination.

        Presently before the Court are the parties' cross-motions for summary judgment.

Because the undisputed facts demonstrate that Plaintiff's excessive and unpredictable

absenteeism prevented her from performing the essential functions of her job, with or without

reasonable accommodation, Rinaldi has failed to make out a claim of disability discrimination.

Further, because Rinaldi was never discouraged from taking, or penalized for taking, FMLA

leave, her claims for interference and retaliation under the FMLA also fail.

Accordingly, Quality King's motion for summary judgment (Dkt. 30) is granted, and Rinaldi's cross-motion for summary judgment (Dkt. 29) is denied.

## BACKGROUND

### I.    Relevant Facts

The following facts are undisputed except where otherwise noted.

#### A.    The Actors

Quality King is a company that sells health and beauty products to retailers throughout the United States. (Def. 56.1[1] ¶ 1.)[2] GSN Trucking ("GSN") is a Quality King subsidiary that employs the truck drivers who deliver Quality King's products. (*Id.* ¶ 2.) Some time prior to 2005,[3] Rinaldi applied for and was hired as an assistant payroll clerk at GSN. (*Id.* ¶ 3.)

#### B.    Rinaldi's Employment at Quality King

In 2005, while at GSN, Rinaldi was promoted from assistant payroll clerk to payroll manager. (*Id.*) After her promotion, Quality King consolidated the GSN payroll department with the Quality King payroll department and Quality King became Rinaldi's employer. (*Id.* ¶ 4.) Despite the consolidation, Rinaldi's job functions remained unchanged; she was still the

---

[1]    Citations to "Def. 56.1" refer to Defendant's Statement of Material Facts pursuant to Local Rule 56.1. (Dkt. 32.) Citations to "Pl. 56.1" refer to Plaintiff's Counter–Statement to Defendant's 56.1 Statement of Material Facts. (Dkt. 29-1.) Citations to "Def. 56.1. Rep." refer to Defendant's reply to Plaintiff's Counter-Statement. (Dkt. 36.)

[2]    The Court construes any disputed facts in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). However, where a party either (i) admits or (ii) denies without citing to admissible evidence facts alleged in the opposing party's Local Rule 56.1 Statement, the Court shall deem such facts undisputed. *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)-(d) ("56.1 Statement"). Thus, a standalone citation to a 56.1 Statement denotes that either the parties have, or the Court has, determined the underlying factual allegation to be undisputed. Any citations to a party's 56.1 Statement incorporates by reference the documents cited therein unless otherwise noted.

[3]    Neither party has indicated the year in which Rinaldi was hired by GSN.

payroll manager for all GSN employees, but she reported to the Human Resources Director at Quality King, Olga Lancaster ("Lancaster"). (*Id.* ¶ 5.) In addition to Rinaldi and Lancaster, the payroll department at Quality King had two other employees. (*Id.* ¶ 6.) One was Phylis Calderone ("Calderone"), Quality King's payroll manager, who was responsible for coordinating payment to over 1,000 Quality King employees. (*Id.*) The other was Linda Semelrath ("Semelrath"), whom Quality King hired to serve as an "assistant" to Calderone and as a "backup" to Rinaldi. (Pl. Tr.[4] 22-23; Cal. Tr.[5] 15-16.) Rinaldi trained Semelrath to perform Rinaldi's job function during Rinaldi's absences from work. (Def. 56.1 ¶ 7.)

Rinaldi managed the weekly payroll of about 100 GSN trucking employees. (*Id.* ¶ 8.) Rinaldi's job duties included processing the driver route logs for all truckers and calculating the mileage pay, delivery pay, pickup pay, case count, breakdown pay, layover pay, and training pay to which each trucker was entitled for the previous week. (*Id.* ¶ 9.) During a typical week, Rinaldi processed between 115 and 120 route logs. (*Id.* ¶ 10.) Although route logs were continuously submitted to the payroll department, the payroll department began processing these logs on Thursday afternoon. (*Id.* ¶ 11.) From Thursday afternoon until Tuesday afternoon, Rinaldi processed route logs one at a time. (*Id.* ¶ 12.) Beginning on Wednesday morning, Rinaldi entered the information she obtained from the logs into the payroll processing software. (*Id.* ¶ 13.) This information had to be submitted by 1 p.m. on Wednesday in order for a register to be created for Rinaldi to review and approve by 3 p.m. (*Id.* ¶ 14.) If Rinaldi did not meet

---

[4]     "Pl. Tr" refers to the transcript of Rinaldi's January 10, 2013 deposition (Dkts. 31-1; 29-2), which is attached as Ex. 1 to the Declaration of Rory McEvoy (Dkt. 31 ("McEvoy Decl.")) and Ex. 1 to the Affirmation of Paul Dashefsky (Dkt. 29-2 ("Dashefsky Aff.")).

[5]     "Cal. Tr" refers to the transcript of Calderone's January 22, 2013 deposition (Dkts. 31-3; 29-2), excerpts of which are attached as Ex. 3 to the Dashefsky Aff.

these deadlines, GSN employees would not get paid. (*Id.* ¶ 15.) On Thursday mornings, Rinaldi personally stuffed paychecks into envelopes for GSN employees, and in the afternoon, she once again began processing route logs. (*Id.*)

In addition to payroll, Rinaldi also handled health insurance for all GSN employees, processed cash advance requests, kept track of vacation, sick time, and absences, and submitted monthly reports to the Accounting Department. (*Id.* ¶ 16.)

C. Quality King Discrimination and Retaliation Policies

When Rinaldi began working at Quality King, she received a copy of the Employee Handbook (the "Handbook"), which contains policies on discrimination, the FMLA, and attendance. (*Id.* ¶ 17.) Rinaldi signed a document acknowledging receipt of these policies, and, in connection with this litigation, has testified that she understood them. (*Id.* ¶ 18.) The Handbook sets forth Quality King's policy prohibiting all forms of employment discrimination, including disability discrimination. (*Id.* ¶ 19.) The policy "related to all terms and conditions of employment, including . . . discipline, . . . leaves of absence, . . . and other working conditions." (*Id.* ¶ 20.) The Handbook invites employees with disabilities to alert Quality King of the need for an accommodation and further states that Quality King would "be happy to work with [employees] to make [their] job[s] easier and more productive in full compliance with any applicable legal requirements to make reasonable accommodations . . . ." (*Id.*) The Policy states that employees "are encouraged to bring these [questions or concerns] to the attention of their immediate supervisor and the Human Resources Department." (*Id.* ¶ 21.) Quality King's policy also prohibits retaliation against employees who complain about discrimination, and the Handbook assures employees that they "can raise concerns and make reports without fear of reprisal." (*Id.* ¶ 22.)

D.  Quality King's FMLA Policy

Quality King employees who worked over 1,250 hours the previous year are eligible for a maximum of 12 weeks of medical leave pursuant to Quality King's FMLA policy.  (*Id.* ¶ 23.) The policy also states that "[u]npaid leave must be granted for . . . a serious health condition that make[s] the employee unable to perform the employee's job."  (*Id.* ¶ 24.)  At either "the employee or employer's option, certain kinds of paid leave may be substituted for unpaid leave." (*Id.* ¶ 25.)  Further, "[t]he employee may be required to provide advance leave notice and medical certification" and "leave may be denied if requirements are not met."  (*Id.* ¶ 26.)

The FMLA section of the Handbook also states that employees will be "restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms."  (*Id.* ¶ 27.)  It further states that the "FMLA makes it unlawful for an employer to: interfere with, restrain, or deny the exercise of rights provided under FMLA; discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA."  (*Id.* ¶ 28.)

Rinaldi testified that she understood her right to take time off under the FMLA, not only because she read the Handbook, but also because she processed FMLA forms for other employees as part of her job functions.  (Pl. Tr. 85-86.)  She also understood her obligation to obtain certification from her doctor, and knew that the only employees ever terminated after exercising their FMLA rights were those that took more than the statutory 12 weeks.  (Def. 56.1 ¶ 30.)

E.  Quality King's Attendance Policy

Quality King's attendance policy requires that if an employee is "absent for three consecutive days or more due to an illness or injury, [she is] required to bring a 'fitness for duty' letter from a physician in order to return to work."  (Pl. Tr. 71, Ex. 9 to Pl. Tr. (Dkt. 31-1 at 59).)  However, whether or not an employee is, in practice, required to bring a "fitness for duty" letter may be at the discretion of management.  (Lanc. Tr.[6] at 47-58.)

F.  Rinaldi's FMLA Leave Between March 17, 2011 and April 25, 2011

On March 17, 2011, Rinaldi did not attend work because she was suffering from anxiety, panic attacks, and depression.  (Def. 56. 1 ¶ 33.)  Rinaldi called Calderone to report that she could not make it into work.  (*Id.* ¶ 34.)  Rinaldi was admitted to the hospital for eight days beginning on March 17, 2011, and her husband notified Quality King of Rinaldi's hospitalization.  (*Id.* ¶ 35.)  Rinaldi stayed in contact with Calderone while she was in the hospital, and told Calderone that she was out due to depression.  (Def. 56. 1 ¶ 36.)  Quality King designated Rinaldi's time out as FMLA leave.  (*Id.* ¶ 37.)

On April 4, 2011, Lancaster sent Rinaldi a letter describing her rights under the FMLA and attaching the forms necessary for approval of Rinaldi's leave.  (*Id.* ¶ 39.)  The leave was approved and lasted for five weeks and two days, through April 22, 2011.  (*Id.* ¶ 40.)  Quality King paid Rinaldi her normal salary for the first three weeks of her leave and used all but one day of her vacation/sick time to continue paying her for the remainder of the leave.  (*Id.* ¶ 41.)  Rinaldi returned to work on April 25, 2011.  (*Id.* ¶ 43.)

---

[6]      "Lanc. Tr" refers to the transcript of Lancaster's January 22, 2013 deposition (Dkts. 31-2; 29-2), excerpts of which are attached as Ex. 2 to both the McEvoy Decl. and the Dashefsky Aff.

### G. Rinaldi's Absences Between May 13, 2011 and July 29, 2011

After returning from her leave, Rinaldi was absent from work on ten occasions between May 13, 2011 and July 29, 2011. (*Id.* ¶ 44.) On eight of those days, Rinaldi's absences were unexcused. (*Id.* ¶ 45.) On those occasions, Rinaldi called Calderone around 8 a.m. to inform Calderone that she (Rinaldi) "was unable to come to work." (*Id.* ¶ 46.) Rinaldi did not call, speak to, or see a doctor, or obtain a doctor's note. (*Id.* ¶ 48.) Rinaldi also missed work on two days for a planned vacation. (Pl. Tr. 121.) Over the course of the two and a half months, Rinaldi never sought an accommodation for her work schedule. (Def. 56. 1 ¶ 50.)

### H. Plaintiff is Put On Probation For Excessive Absenteeism - July 29, 2011

On Friday July 29, 2011—Rinaldi's tenth absence following her approved FMLA leave in March and April of 2011—Lancaster distributed to Rinaldi a "warning letter" regarding her excessive absenteeism. (Pl. Tr. 132, Ex. 14 to Pl. Tr.[7]) The warning letter noted that Rinaldi had been absent ten days since returning from leave, and stated that the functions of the job require "attention to detail" and availability "to tend to the needs of the employees that [Rinaldi] prepares payroll for." (Def. 56. 1 ¶ 52.) The notice further states that Rinaldi's absenteeism was "affecting the department as a whole" because "[t]he rest of the staff is picking up the slack which is not fair." (*Id.* ¶ 53.) It concluded that Rinaldi was being put on a 90-day probation and that if "she is absent for any reason in the next 90 days, [Quality King] would have no alternative but to terminate her." (Ex. 14 to Pl. Tr.) Rinaldi first received the notice when she returned to work on Monday, August 1, 2011. (Def. 56. 1 ¶ 55; Pl. 56. 1 ¶ 55.)

---

[7]     Ex. 14 to Pl. Tr. is the "EMPLOYEE WARNING NOTICE" Rinaldi received on August 1, 2011. It is located at Dkt. 31-1 at ECF 86.

I.  Plaintiff is Granted FMLA Leave During Probation – August 1-5, 2011

Rinaldi left work immediately after reviewing the warning notice, and was considered absent from work.  (Def. 56. 1 ¶ 56.)  Rinaldi went to the hospital, but was not admitted.  (*Id.* ¶ 57.)  On August 2, 2011, Rinaldi called Calderone to inform her that she was having a bad reaction to her depression medication and that her doctor had instructed her to remain home for the rest of the week, which she did.  (*Id.* ¶ 58.)  On August 4, 2011, Lancaster wrote Rinaldi a letter acknowledging that Rinaldi's absence was for the purpose of seeking "more medical attention for [her] condition."  (*Id.* ¶ 59.)  The letter said that with a doctor's note, the week-long absence would be considered FMLA leave.  (*Id.* ¶ 60.)  The letter also offered Rinaldi the option to "take the remainder of [her] FMLA leave" or return to work, with the appropriate doctor's note, to continue serving out her probationary period.  (*Id.* ¶ 61.)  Rinaldi declined to use her FMLA leave, and returned to work full time because her condition dictated that she might need to take single days off in the future.  (Pl. Tr. 145-47.)

At no time during the probationary period did Rinaldi ever seek any accommodation to her work schedule.  (Def. 56. 1 ¶ 63.)  Quality King offered to allow Rinaldi to work fewer hours per day, but she declined the offer.  (*Id.* ¶ 64.)

J.  Rinaldi's Termination – October 31, 2011

Toward the end of her 90-day probation period, Rinaldi was absent on October 27 and 28, 2011 because she had "severe pain in [her] right side and [] couldn't breathe."  (Pl. Tr. 149-151.)  Rinaldi was not hospitalized for this condition.  (Pl. Tr. 150.)  She saw a physician's assistant, but did not receive a diagnosis.  (*Id.*)  She had never had the pain before, and it did not reoccur.  (*Id.* at 150-51.)

When Rinaldi returned to work on October 31, 2011, she brought with her a doctor's note, which stated, "please excuse the above patient from work 10/27, 10/28. May return on 10/31." (Def. 56. 1 ¶¶ 67-68.) Upon receipt of the note, Lancaster informed Rinaldi that she was going to be terminated for violating the terms of her probation related to absence. (*Id.* at 68.)

## DISCUSSION

### I.    <u>Summary Judgment Standard</u>

Summary judgment is proper only where, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Redd v. N.Y. Div. of Parole,* 678 F.3d 166, 173-74 (2d Cir. 2012). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material within the meaning of Rule 56 where it "might affect the outcome of the suit under the governing law." *Id.* In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003) (citation and quotation omitted).

This standard imposes the initial burden on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial. *Id.* at 324*; see also Anderson*, 477 U.S. at 256-57. The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [their] version of the events is not wholly fanciful."

*D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (collecting cases). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587.)

The Court is mindful that, "because direct evidence of discriminatory intent is rare," an "extra measure of caution" is warranted before affirming summary judgment. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001); *see e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). Ultimately, the test for summary judgment "is whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

## II.   Rinaldi's Disability Discrimination Claims

Rinaldi alleges that she was terminated due to her disability in violation of the ADA and the NYSHRL.

### A. Applicable Law

The ADA prohibits employment discrimination by a "covered entity . . . against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). "Discrimination" consists of taking any action that adversely affects an employee. *See* 42 U.S.C. § 12112(b)(1). A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §§ 12111(2), (8); *see also Lyons v. Legal Aid Society,* 68

F.3d 1512, 1514 (2d Cir. 1995).  As such, a covered employer of an individual with a disability is required to make reasonable accommodations for that individual, unless such "accommodation would impose an undue hardship" on the employer.  42 U.S.C. § 12112(b)(5)(A); *see also McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009).  The employer is also prohibited from retaliating against a disabled employee for engaging in activities protected by the statute.  42 U.S.C. § 12203(b).

Disability discrimination claims under the ADA and the NYSHRL are subject to the burden-shifting framework set out in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973).  *Mcbride*, 583 F.3d at 96 (ADA); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n. 1 (NYSHRL).  Under the *McDonnell-Douglas* burden-shifting framework, the plaintiff must first establish a *prima facie* case of discrimination.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (citations omitted).  If the plaintiff succeeds, the burden then shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for its adverse action(s) against the plaintiff.  *Id.*  Should the defendant come forward with a non-discriminatory reason, the "*McDonnell–Douglas* framework and its presumptions and burdens disappear," leaving the sole remaining issue of "discrimination *vel non*."  *Id.* at 142-43.  This final question requires the Plaintiff to "prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action."  *Polito v. Tri-Wire Eng'g Solution, Inc.*, 699 F. Supp. 2d 480, 491 (E.D.N.Y. 2010) (citing *Reeves*, 530 U.S. at 143).

In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that: (1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered an adverse employment

action because of her disability. *See Jacques v. DiMarzio, Inc.,* 386 F.3d 192, 198 (2d Cir. 2004) (citing *Cameron v. Cmty. Aid for Retarded Children, Inc.,* 335 F.3d 60, 63 (2d Cir. 2003)); *Shannon v. N.Y. City Transit Auth.,* 332 F.3d 95, 99 (2d Cir. 2003).

With respect to the third element, "it is generally the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *McElwee v. Cnty. of Orange,* 700 F.3d 635, 641-42 (2d Cir. 2012). "Once the plaintiff has demonstrated that there is a 'plausible accommodation, the costs of which, facially, do not clearly exceed its benefits,' the defendant bears the burden of proving that the requested accommodation is not reasonable. *Id.* (quoting *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 138 (2d Cir. 1995)). Only then does the burden shift to the defendant to prove that "the requested accommodation is not reasonable." *Id.*

The parties do not dispute that Rinaldi's depression constitutes a disability within the meaning of the ADA, that Quality King was covered by the ADA and on notice of Rinaldi's disability, or that she suffered an adverse employment action. The only inquiry as to Rinaldi's *prima facie* case is whether she can establish that she was qualified to perform the essential functions of her job, with or without a reasonable accommodation.

B. Rinaldi's Performance of Her Essential Job Functions

Quality King argues that at the time it terminated Rinaldi in October of 2011, she was unable to perform the essential functions of her job due to her excessive absences. "Courts have consistently ruled that 'an employee cannot be considered otherwise qualified when she is unable to report to work at the time required, because she is not able to perform the essential functions of her job.'" *Lewis v. New York City Police Dep't,* 908 F. Supp. 2d 313, 327 (E.D.N.Y. 2012) *aff'd sub nom. Lewis v. NYC Police Dep't,* 537 F. App'x 11 (2d Cir. 2013) (quoting *Bobrowsky v.*

*New York City Bd. of Educ.,* 1999 WL 737919, at *4 (E.D.N.Y. Sept. 16, 1999)); *see also, e.g., Micari v. Trans World Airlines, Inc.*, 43 F. Supp. 2d 275, 281 (E.D.N.Y. 1999) *aff'd*, 205 F.3d 1323 (2d Cir. 1999) (collecting cases). "Indeed, courts have specifically noted that '[t]he ADA does not require employers to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability.'" *Id.* (quoting *Mescall v. Marra,* 49 F.Supp.2d 365, 374 n. 18 (S.D.N.Y. 1999)); *see also Pierce v. Highland Falls–Fort Montgomery Central Sch. Dist.,* 2011 WL 4526520, at *5 (S.D.N.Y. Sept. 28, 2011) (noting that plaintiff's "persistent absence from work, alone, precludes him from being considered qualified under the ADA" even assuming that plaintiff's absences were a result of a recognized disability); *Aquinas v. Fed. Exp. Corp.,* 940 F.Supp. 73, 79 (S.D.N.Y. 1996) (finding that plaintiff's proposal for reasonable accommodation "amounts to a request for permission to work only when her illness permits," and that such request "necessarily undermines the policy of regular attendance that is essential to her job."); *id.* ("[A] disabled employee who cannot get to work as often as her employer requires is not 'otherwise qualified' for her job under the ADA, and her employer is not required to make allowances for her absenteeism.").

Rinaldi has not demonstrated that she could perform an "essential function" of her employment, namely "showing up for work." *Ramirez v. New York City Bd. of Educ.*, 481 F. Supp. 2d 209, 221 (E.D.N.Y. 2007) (dismissing plaintiff's ADA claim because, though the parties agreed he was capable of performing his duties, his absenteeism prevented him from doing so). Here, Plaintiff was absent for five out of six weeks from March 17, 2011 to April 25, 2011 on FMLA leave for which she was paid. Thereafter, Rinaldi was absent, without a doctor's note, on ten days from May 13, 2011 to July 29, 2011. (Def. 56. 1 ¶ 44.) On eight of those occasions, she provided no advanced notice. (*Id.* ¶ 46.) On July 29, 2011, the day of Rinaldi's

tenth absence, she was placed on probation, and notified that if she was "absent for any reason in the next 90 days," Quality King would terminate her. (Ex. 14 to Pl. Tr.) Yet she left work immediately after receiving the notice. Rather than terminate Rinaldi, Quality King permitted her to take an additional period of FMLA leave, and even proposed that she take more than the one week of FMLA leave Rinaldi had requested. Rinaldi refused. After she returned from her second FMLA leave, and while still on probation, Rinaldi missed work twice due to back pain, which she had not experienced before or since. (Pl. Tr. 150.) These final two absences while still on probation resulted in Rinaldi's termination.

It is not Rinaldi's absences alone that cause the Court to conclude that she is not a qualified individual under the FMLA. It is that fact taken together with Rinaldi's refusal to propose or even accept a reasonable accommodation that would have helped her accomplish the essential functions of her job. Even after she was placed on probation, Quality King offered to reduce her working hours, and repeatedly offered her the opportunity to take more FMLA leave. (Pl. Tr. 131, 143, 147-48, Ex. 15 to Pl Tr.[8]) For an employee whose primary difficulty was itself being at work, time off and reduced hours were logical, reasonable accommodations. Rinaldi refused both offers, however, because, she alleges, she could not financially afford to accept them and did not believe that either accommodation would address her needs. (Pl. Tr. 131, 145-47.) While the ADA requires reasonable accommodation, it does not require elimination of any of the job's essential functions. *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991); *see also Borkowski,* 63 F.3d 131 at 137-38 (citing *School Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 287 n. 17, (1987)); *Micari,* 43 F. Supp. 2d at 281 ("It is not surprising that attendance has been found to be a prerequisite to performing the essential functions of a job."). Nor does it

---

[8]     Ex. 15 to Pl. Tr. is the August 4, 2011 letter Quality King sent Rinaldi during her second FMLA period. It is located at Dkt. 31-1 at ECF 88.

require an employer to develop a schedule whereby an employee works only when her illness permits. *See, e.g., Pierce,* 2011 WL 4526520, at *5 ("The ADA does not require an employer to make a reasonable accommodation for an employee who does not attend work, nor does the Act require an employer to retain such an employee."); *Lewis*, 908 F. Supp. 2d at 327 ("plaintiff's proposal for reasonable accommodation 'amounts to a request for permission to work only when her illness permits"; such a request "necessarily undermines the policy of regular attendance that is essential to her job.")

In sum, "[g]iven the sporadic and unpredictable nature of Plaintiff's absences," it was "impossible for [Quality King] to know from one day to the next," whether Rinaldi would report to work. *Lewis*, 908 F. Supp. 2d at 328 (quotation marks omitted). If a reasonable accommodation that would have ameliorated Rinaldi's attendance issues did exist, Rinaldi never proposed it, let alone demonstrated that its costs would not clearly exceed its benefits. *See McElwee,* 700 F.3d at 642; *Borkowski*, 63 F.3d at 138. In fact, she denied both reasonable accommodations that Quality King offered her. Therefore, Rinaldi has failed to establish a *prima facie* case that Quality King violated the ADA by failing to accommodate her disabilities. *See McElwee,* 700 F.3d at 642; *McBride,* 583 F.3d at 97.

C. Rinaldi's NYSHRL Claim

Like the ADA, the NYSHRL forbids employers to terminate or otherwise discriminate against an employee because of a disability. *See* N.Y. Exec. L. § 296(1)(a). As noted *supra*, NYSHRL claims are analyzed under the same *McDonnell-Douglas* burden-shifting framework as ADA claims. *See Kinneary v. City of New York*, 601 F.3d 151, 158 (2d Cir. 2010); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 257 (E.D.N.Y. 2012) *aff'd*, 713 F.3d 163 (2d Cir. 2013) ("Claims under the NYSHRL are analyzed under the same standards as federal

discrimination claims.").  Therefore, the analysis of Rinaldi's claims for disability discrimination under the ADA applies equally to her claims under the NYSHRL, and summary judgment on that claim must be granted for all of the same reasons discussed above.

### III.    Rinaldi's FMLA Claims

The FMLA entitles covered employees to take up to 12 weeks of leave per year where the employee suffers from a serious health condition that makes the employee unable to perform the functions of his or her position.  29 U.S.C. §§ 2612(a)(1)(D), (b); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006).  "The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11)(A)(B).

Interfering with, restraining or denying an employee's rights under the FMLA is unlawful.  29 U.S.C. § 2615(a).  Employers, moreover, are prohibited from discriminating against an employee "for having exercised or attempted to exercise FMLA rights."  29 C.F.R. § 825.220; *see also Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004) (per curiam).  In the Second Circuit, these two prohibitions equate to separate and distinct claims for interference and retaliation under the FMLA.  *See Sista*, 445 F.3d at 175; *see also Potenza,* 365 F.3d at 167 (discussing the distinction between interference and retaliation).  Rinaldi asserts both.  Neither has merit.

A.  Rinaldi's Interference Claim

Plaintiff argues that Quality King interfered with her rights under the FMLA by discouraging her from taking intermittent leave.  (Dkt. 29-3 ("Pl. Op.") at 12.)[9]

"Regulations promulgated under FMLA provide, '[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'"  *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 535 (S.D.N.Y. 2009) (quoting 29 C.F.R. § 825.220(b) (internal quotes omitted)).  A plaintiff proceeding on a "discouragement theory" must offer evidence that she tried to assert her FMLA rights but was discouraged from doing so in such a way that would have "dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." *Reilly*, 620 F. Supp. 2d at 535 (citing *Golden v. New York City Dept. of Environmental Protection,* 2007 WL 4258241 (S.D.N.Y. Dec. 03, 2007)).

As an initial matter, Plaintiff was not entitled to intermittent FMLA leave.  The relevant statute states that FMLA leave "shall not be taken by an employee intermittently or on a reduced leave schedule unless the employee and the employer of the employee agree otherwise."  The parties never made such an agreement here.[10]  29 U.S.C.A. § 2612.

Moreover, even assuming Rinaldi was entitled to intermittent leave, she has not raised a genuine issue of material fact demonstrating that Quality King ever discouraged her from taking

---

[9]      To the extent Rinaldi is relying on anything other than a "discouragement theory" to support her claim, her argument fails.  Where, as here, an employee is granted all of the FMLA leave for which she applied, she has not stated a typical interference claim.  *See, e.g., Esser v. Rainbow Advertising Sales Corp*., 448 F. Supp. 2d 574, 580 (S.D.N.Y. 2006); *Mcfarlane v. Chao*, No. 04 Civ. 4871, 2007 WL 1017604, at *29 (S.D.N.Y. Mar. 30, 2007); *Tomici v. N.Y. City Dept' Educ.*, No. 11 Civ. 2173, 2012 US. Dist. LEXIS 179577 (E.D.N.Y. December 19, 2012).

[10]      As previously discussed, Quality King did offer a reduced schedule as an accommodation, but Plaintiff turned it down.

FMLA leave. Plaintiff argues, briefly and without citations to the record, that "Lancaster explicitly advised [Rinaldi] that, although she had two weeks accrued FMLA to which she was entitled, she could not use them on an intermittent basis according to her medical needs." (Pl. Op. at 12.) This statement, in light of the totality of the circumstances, would not have dissuaded a "similarly situated employee of ordinary resolve from attempting to exercise FMLA rights." *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 201 (S.D.N.Y. 2009); *see also Golden,* 2007 WL 4258241, at *3. In determining whether Quality King was attempting to discourage her from taking additional FMLA leave, Rinaldi would have had to consider that she had previously been: (1) granted a five-week FMLA leave period from March 17, 2011 through April 25, 2011; (2) granted a second period of FMLA leave in August 2011, despite her probationary status; and (3) offered the opportunity (which she declined) to take additional FMLA leave while out on leave in August 2011. The Court finds that a reasonable person, given those circumstances, would not have been discouraged from taking any FMLA leave to which she was entitled. Rinaldi's claim for FMLA interference therefore fails.[11]

### B. FMLA Retaliation

Rinaldi claims that Quality King retaliated against her because she availed herself of FMLA leave. Specifically, she asserts that a "contributing factor" to Plaintiff's termination "must have been the total prior number of days absent, including the days taken for FMLA leave explicitly, or the days that were for a serious medical condition." (*See* Pl. Op. at 13.)

---

[11] The Court notes that Rinaldi did not allege an FMLA interference claim in her Amended Complaint. (Dkt. 13.) However, because she made reference to such claim in her original complaint (Dkt. 1 ¶ 18) and because Plaintiff included it in her pre-motion conference letter (Dkt. 17 at 2), the Court addresses it here rather than requiring Plaintiff to amend.

At the outset, the Court notes that Plaintiff has effectively abandoned her FMLA retaliation claim. In her opposition brief, Plaintiff spends no time addressing this claim to which Quality King devoted significant time in its initial moving brief. (Dkt. 33 (Def. Br.) at 18-23). Indeed, although Plaintiff's opposition brief contains a joint heading for her retaliation and interference claims under the FMLA, the one-page argument in that section, which is styled both as an opposition to summary judgment and argument in favor of her own motion for summary judgment, does not discuss retaliation in any substance. (Pl. Op. at 12-13.) Plaintiff's failure to address Defendant's arguments in favor of dismissing her retaliation claim signals her abandonment of it. *See, e.g.*, *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006) (Bianco, J.) ("Because plaintiff's opposition papers did not address defendants' motion for summary judgment on this claim, the claim is deemed abandoned and summary judgment could be granted on that basis alone."); *Taylor v. City of N.Y.*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (Glasser, J.) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").[12]

---

[12] *See also Struthers v. City of N.Y.*, No. 12-CV-242, 2013 WL 2390721, at *18 (E.D.N.Y. May 31, 2013) (Gleeson, J.) ("I deem [the plaintiff's] claim against the City abandoned. [The plaintiff] fails to address defendants' argument for summary judgment on this claim in his opposition brief."); *Robinson v. Roosevelt Union Free Sch. Dist.*, No. 10-CV-834, 2012 WL 1980410, at *6 (E.D.N.Y. May 31, 2012) (Feuerstein, J.) ("[T]he Court considers this claim abandoned because plaintiff has failed to address it in her opposition brief."); *Santiago v. City of N.Y.*, No. 05-CV-3668, 2009 WL 935720, at *11 n.19 (E.D.N.Y. Mar. 31, 2009) (Mauskopf, J.) ("[P]laintiff does not argue any claim under the First Amendment in her [summary judgment] opposition. To the extent plaintiff did intend to pursue such a claim, it is hereby deemed abandoned and so dismissed."); *Williams v. British Airways, PLC*, Nos. 04-CV-0471, 06-CV-5085, 2007 WL 2907426, at *13 (E.D.N.Y. Sept. 27, 2007) (Sifton, J.) ("Plaintiff does not discuss or argue his retaliation claim in his opposition brief. . . . On this basis alone, the court could grant summary judgment on plaintiff's relation claims under Title VII and Section 1981."); *DeVito v. Barrant*, No. 03-CV-1927, 2005 WL 2033722, at *10 (E.D.N.Y. Aug. 23, 2005) (Irizarry, J.) ("The court deems plaintiff's negligent hiring and retention claims abandoned by

In any event, Plaintiff's claim is meritless. FMLA retaliation claims are analyzed under the previously discussed *McDonnell-Douglas* burden shifting framework. *Potenza*, 365 F.3d at 168. At the first step, the plaintiff must make out a *prima facie* case of FMLA retaliation, which requires a demonstration that: (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Potenza*, 365 F.3d at 168.

Here, the analysis need not go past the first step as Rinaldi is unable to satisfy the fourth element of her *prima facie* case. She has not put forth evidence to support her claim that she was put on probation or terminated *because* she exercised her right to FMLA leave. Specifically, Rinaldi was not penalized for taking her first period of FMLA leave, which lasted from March 17 to April 25, 2011. It was only after having ten absences between May 12, 2011 and July 29, 2011, that she was placed on probation (Def. 56.1 ¶¶ 44-48; *see also* Pl. Tr. 132, Ex. 14 to Pl Tr.) Furthermore, Rinaldi was subsequently provided with an additional period of FMLA leave in August, 2011, *without repercussion*, despite her probationary status. Indeed, during her second leave period, Quality King offered Rinaldi the opportunity to take additional FMLA time. (Def. 56. 1 ¶ 60.)

Not only is Plaintiff's speculative argument that her termination "must have been" related to her FMLA absences (Pl. Op. at 13) insufficient at the summary judgment stage, *see D'Amico*, 132 F.3d at 149, it is especially dubious in light of the lapse in time from Rinaldi's FMLA leave to her termination. Although an employee can raise an inference of discrimination when the alleged adverse employment action occurs in close proximity to the employee's engagement in

virtue of his failure to address them in his memorandum responding to defendants' summary judgment motion.").

an FMLA protected act, "district courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Garrett v. Garden City Hotel, Inc.*, 05-CV-0962 JFB AKT, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (applying this principal in finding that plaintiff failed to make out a *prima facie* case of Title VII retaliation) (collecting cases). Here, it is undisputed that Rinaldi (i) applied for and was granted FMLA leave in March of 2011; (ii) was granted additional leave by Quality King from August 1-5, 2011; and (iii) was not discharged until October 31, 2011. (Pl. Tr. 82, 102, 143-44, 151-52, Ex. 15 to Pl Tr.) Rinaldi was terminated more than two and half months after her last FMLA leave request, which, though not necessarily dispositive, negates any inference of retaliation.

Lastly, Rinaldi's final two absences, which occurred on October 27-28, 2011, were allegedly due to pain in her side. Pain in one's side, unlike depression, does not qualify as a "serious medical condition" that warrants absence under the FMLA. 29 U.S.C. § 2612(a)(1)(D). The Act defines "serious medical condition" as an "illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital . . . or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Rinaldi did not seek inpatient care, and she did not require continuing treatment by her doctor. (Pl. Tr. 149-151.)

In sum, Rinaldi's FMLA-related absences were treated appropriately and in accordance with the applicable laws. Rinaldi's unscheduled, unpredictable absences, however, earned her probation and ultimately cost Rinaldi her job. Accordingly, Quality King's motion for summary judgment as to Plaintiff's FMLA retaliation claim is granted.

**CONCLUSION**

For the foregoing reasons, Quality King's motion for summary judgment (Dkt. 30) is GRANTED, and Rinaldi's cross-motion for summary judgment (Dkt. 29) is DENIED. The Clerk of the Court is respectfully directed to enter judgment in favor of Defendant Quality King, and close this case.

SO ORDERED:

/s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: July 26, 2014
Brooklyn, New York